Patricia L. Zobel
DeLisio Moran Geraghty & Zobel, P.C.
943 W. 6th Avenue
Anchorage, AK 99501
Ph: (907) 279-9574
Fax: (907) 276-4231
pzobel@dmgz.com

Parker C. Folse, III (*pro hac vice*)
Floyd G. Short (*pro hac vice*)
Susman Godfrey L.L.P.
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Ph: (206) 373-7381
Fax: (206) 516-3883
fshort@susmangodfrey.com
pfolse@susmangodfrey.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| PETRO STAR INC., ) | |
| ) | |
| Plaintiff, ) | Case No. 3:11-cv-0064-RRB |
| ) | |
| v. ) | |
| ) | |
| BP OIL SUPPLY CO., BP PRODUCTS ) | |
| NORTH AMERICA INC. ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |

**FIRST AMENDED COMPLAINT**

1

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 1 of 20

# JURISDICTIONAL STATEMENT

1. The Court has jurisdiction over this suit pursuant to 28 U.S.C. § 1332(a) and (c). Plaintiff and defendants are corporate citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

# PARTIES

2. Plaintiff Petro Star Inc. ("Petro Star") is an Alaskan corporation with its principal place of business in Anchorage, Alaska.

3. Defendant BP Oil Supply Co. was, at all relevant times, a Delaware corporation with its principal place of business in Warrenville, Illinois.

4. Defendant BP Products North America Inc. is a Maryland corporation with its principal place of business in Baltimore, Maryland, or Houston, Texas. On information and belief, BP Products North America Inc. is successor-in-interest to BP Oil Supply Co. by merger, and therefore succeeded to all liabilities and obligations of BP Oil Supply Co. asserted herein. Collectively, the two companies are referred to herein as "BP". BP may be served with process through its registered agent Prentice-Hall Corporation System, Inc., 9360 Glacier Hwy, Suite 202, Juneau, Alaska 99801.

# VENUE

5. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because BP resides in this District pursuant to 28 U.S.C. § 1391(c) and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

2

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 2 of 20

## FACTS

6. Petro Star owns and operates a refinery in North Pole, Alaska, and a refinery in Valdez, Alaska. Both refineries receive crude oil from the Trans Alaskan Pipeline System ("TAPS"), retain certain fractions of that oil to use as refinery fuel and to manufacture products for sale, and then return the unused fractions of the oil to TAPS. For many years prior to July 1, 2000, Petro Star bought Alaska North Slope ("ANS") crude oil from BP for delivery to those refineries, under an arrangement in which Petro Star purchased the oil that it retained and exchanged the oil that it returned to TAPS. For purposes relevant to this suit, those purchases and exchanges were addressed by the following contracts between Petro Star and BP:

> (1) BP Contract 13297 & 14022, a Term ANS Exchange Agreement effective as of October 2, 1991, which provided for delivery of crude oil to Petro Star's North Pole refinery and exchanges of oil at the point of delivery (the "1991 Contract");
>
> (2) BPOSC Contract 15170, a Term Crude Oil Sales Agreement effective July 21, 1992, which provided for delivery of crude oil to Petro Star's Valdez refinery (the "1992 Sales Contract");
>
> (3) BPOSC Contract 15171, a Term Crude Oil Exchange Agreement effective July 21, 1992, which provided for exchanges of crude oil between BP and Petro Star at the point of delivery for the Valdez refinery (the "1992 Exchange Contract");
>
> (4) BPOSC Contract No. SA55425, a/k/a PETRO STAR Contract No. 2000-1, executed in December 1999, which superseded and replaced the 1991 Contract with respect to deliveries of crude oil to the North Pole refinery ("the 1999 North Pole Sales Contract");
>
> (5) BPOSC Contract No. BS55428, a/k/a PETRO STAR Contract No. 2000-2, also executed in December 1999 and effective in April 2000, which superseded and replaced the 1991 Contract with respect to exchanges of crude oil at the North Pole refinery delivery point ("the 1999 North Pole Exchange Contract");
>
> (6) BPOSC Contract No. SA55427, a/k/a PETRO STAR Contract No. 2000-3, also executed in December 1999 and effective in April 2000, which superseded and replaced the 1992 Sales Contract (the "1999 Valdez Sales Contract"); and

3

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 3 of 20

(7) BPOSC Contract No. BS55429, a/k/a PETRO STAR Contract No. 2000-4, also executed in December 1999 and effective in April 2000, which superseded and replaced the 1992 Exchange Contract (the "1999 Valdez Exchange Contract").

The 1991 Contract, the 1992 Sales Contract, the 1992 Exchange Contract, the 1999 North Pole Sales Contract, the 1999 North Pole Exchange Contract, the 1999 Valdez Sales Contract, and the 1999 Valdez Exchange Contract, including written amendments, are collectively referred to in this Complaint as the "BP-Petro Star Contracts."

7. Under the 1991 Contract, BP arranged for transportation of the oil from Pump Station No. 1 on the ANS via TAPS to the junction of TAPS and a pipeline in North Pole, Alaska, owned and operated by the Golden Valley Electric Association (the "GVEA pipeline"). The GVEA pipeline, in turn, provided transport of the crude oil to Petro Star's nearby North Pole refinery.

8. BP also sold ANS crude oil to other customers for delivery to the U.S. West Coast. BP transported that oil via TAPS from the ANS to the Valdez Marine Terminal ("VMT"), where the crude oil was loaded onto tankers for marine transportation to refinery destinations on the West Coast.

9. At all relevant times, TAPS was owned in undivided joint interests by subsidiaries of most of the oil companies that produced ANS crude oil and shipped it via TAPS. BP's affiliate BP Pipelines (Alaska) Inc. was at all relevant times one of the TAPS carriers.

10. The rates charged by the TAPS carriers for transport of ANS crude oil were at all relevant times subject to government regulation. With respect to oil delivered to markets on the U.S. West Coast (*i.e.*, interstate shipments), rates were subject to regulation by the Federal

4

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 4 of 20

Energy Regulatory Commission ("FERC"). With respect to ANS crude oil removed from TAPS in Alaska and processed for sale in local markets, rates were governed by the Regulatory Commission of Alaska ("RCA") or its predecessor, the Alaska Public Utilities Commission, pursuant to the Alaska Pipeline Act. The Alaska Pipeline Act requires that oil pipelines be operated as common carriers and gives the RCA responsibility for ensuring that rates for intrastate transportation are just and reasonable.

11. BP was responsible for paying the TAPS carriers for transportation of ANS crude oil from Pump Station No. 1 on the ANS to the junction of TAPS and the GVEA pipeline for ultimate delivery to Petro Star's North Pole refinery. However, BP's 1991 Contract with Petro Star provided a pricing formula that passed along transportation costs to Petro Star.

12. In substance, the pricing formula started with BP's price for ANS crude oil delivered to the West Coast. The formula then made adjustments to account for the fact that the crude oil BP was delivering to Petro Star was not being shipped to the West Coast but was instead shipped intrastate to the TAPS-GVEA junction in North Pole. First, the formula provided for deduction of an amount that the parties deemed to represent the cost of marine transportation from VMT to the West Coast. Second, the formula provided for a further deduction representing the "implied TAPS [] tariff differential" for transporting crude oil from the TAPS-GVEA junction to the VMT.

13. At all relevant times, there was no TAPS tariff applicable to transportation of oil from the TAPS-GVEA junction to the VMT. Petro Star is informed and believes that BP calculated the implied tariff differential between the TAPS-GVEA connection and the VMT by

5

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 5 of 20

subtracting (x) the intrastate tariff from Pump Station No. 1 to the TAPS-GVEA connection from (y) the interstate tariff between Pump Station No. 1 and the VMT. Deducting this implied tariff differential from BP's price for ANS crude oil delivered to the West Coast was mathematically the same as (i) subtracting the interstate Pump Station No. 1 to VMT tariff (which, when combined with the deduction for marine transportation from the VMT to the West Coast, had the effect of eliminating all transportation charges from Pump Station No. 1 to the West Coast and therefore valuing the oil at Pump Station No. 1, the TAPS' northern terminus), and then (ii) adding the intrastate tariff from Pump Station No. 1 to the TAPS-GVEA connection (which adjusted the Pump Station No. 1 value of the oil for the added cost to deliver it to Petro Star at the TAPS-GVEA Connection).

14. Schematically, the relevant price paid by Petro Star under the 1991 Contract was therefore the result of the following calculation: West Coast Price – A – B + C.

6
FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 6 of 20



15. In other words, under the 1991 Contract, BP began with a price for ANS crude oil delivered to the West Coast, "backed out" components representing the interstate transportation charge for shipment of oil from Pump Station No. 1 to the West Coast, and then added the intrastate TAPS tariff rate for shipment from Pump Station No. 1 to the GVEA pipeline junction.

16. In December 1999, BP and Petro Star executed the 1999 North Pole Sales Contract, which by its terms replaced and superseded the 1991 Contract with respect to sales and

7

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 7 of 20

delivery of ANS crude oil at the TAPS-GVEA junction. The pricing formula in the replacement contract was in substance no different than the formula in the 1991 Contract, though the language was revised to add clarity. It began with a delivered West Coast price for ANS crude oil, subtracted an amount representing the cost of marine transportation from VMT to the West Coast, further subtracted the average TAPS tariff rate for shipments from Pump Station No. 1 to the VMT, and then added the BP Pipelines TAPS tariff rate for shipments from Pump Station No. 1 to the GVEA pipeline junction.

17. The 1992 Sales Contract, which governed shipments from the ANS to Petro Star's Valdez refinery, and the 1992 Exchange Contract, which governed exchanges at the delivery point for the Valdez refinery, taken together, were similar to the 1991 Contract that governed shipments and exchanges for the North Pole refinery. Like the 1991 Contract, the 1992 Sales Contract also included a pricing formula that began with a price for ANS crude oil delivered to the West Coast and then provided for deduction of an amount representing charges for marine shipment from VMT to the West Coast. It then provided for a further deduction representing the "implied TAPS [] tariff differential" for transporting crude oil from the junction of Petro Star's Valdez refinery and the VMT.

18. However, at all relevant times, there was no TAPS tariff applicable to transportation of oil from the junction of Petro Star's Valdez refinery to the VMT. Petro Star is informed and believes that BP calculated the implied tariff differential between Petro Star's Valdez Refinery connection and the VMT by subtracting (x) the intrastate tariff from Pump Station No. 1 to the Valdez Refinery connection from (y) the interstate tariff between Pump

8

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Station No. 1 and the VMT. Subtracting this implied tariff differential from the price for ANS crude oil delivered to the West Coast was mathematically the same as (i) subtracting the interstate Pump Station No. 1 to VMT tariff (which, when combined with the deduction for marine transportation from the VMT to the West Coast, had the effect of eliminating all transportation charges from Pump Station No. 1 to the West Coast and therefore valuing the oil at Pump Station No. 1, the TAPS' northern terminus) and then (ii) adding the intrastate tariff from Pump Station No. 1 to the Valdez Refinery connection (which adjusted the Pump Station No. 1 value of the oil for the added cost to deliver it to Petro Star at the Valdez Refinery Connection).

19. Schematically, the relevant price paid by Petro Star under the 1992 Sales Contract was therefore the result of the following calculation: West Coast Price – A – B + C.

9

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100



20. In other words, under the 1992 Sales Contract, BP began with a price for ANS crude oil delivered to the West Coast, "backed out" components representing the interstate transportation charge for shipment from ANS to the West Coast, and then added the intrastate TAPS tariff rate for shipment from ANS to Petro Star's Valdez refinery junction.

21. In December 1999, BP and Petro Star executed the 1999 Valdez Sales Contract and 1999 Valdez Exchange Contract, which by their terms replaced and superseded the 1992

10

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 10 of 20

Sales Contract and 1992 Exchange Contract. The pricing formula in the 1999 Valdez Sales Contract was in substance no different than the formula in the 1992 Sales Contract, though the language was revised to add clarity. It began with a delivered West Coast price for ANS crude oil, subtracted an amount representing the cost of marine transportation from VMT to the West Coast, further subtracted the average TAPS tariff rate for shipments from Pump Station No. 1 to the VMT, and then added the BP Pipelines TAPS tariff rate for shipments from Pump Station No. 1 to Petro Star's Valdez refinery junction.

22. In short, upon information and belief, under all four of the BP-Petro Star Contracts governing sales and delivery of crude oil, Petro Star paid BP a price that incorporated the applicable intrastate TAPS tariff rates for shipments from the ANS to either the GVEA pipeline junction serving Petro Star's North Pole refinery or to the junction of TAPS and Petro Star's Valdez refinery.

23. Under the regulatory regime established by the Alaska Pipeline Act, the TAPS carriers proposed intrastate tariff rates for 1997. In December 1996, certain shippers of ANS crude oil protested those rates. In response to the protests, the RCA suspended the rates and began an investigation of their lawfulness. The RCA subsequently also suspended the TAPS carriers' intrastate rates for 1998, 1999, and 2000, thereby preventing them from becoming final and effective. However, the RCA permitted the TAPS carriers to collect temporary, interim rates equal to the carriers' proposed rates for 1997 – 2000, subject to refund in the event they exceeded the final rates to be established by the RCA as a result of its investigation.

11

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 11 of 20

24. For purposes of determining prices charged to Petro Star under the BP-Petro Star Contracts described above, BP applied the temporary rates charged by the TAPS carriers, which, upon information and belief, BP was itself paying to ship ANS crude oil to Petro Star.

25. In November 2002, the RCA finally completed its investigation and issued Order No. 151 in Docket P-97-4. In that order, the RCA determined that the TAPS carriers' proposed intrastate rates for 1997 – 2000, which the carriers had collected on an interim basis from shippers such as BP, were not just and reasonable under the Alaska Pipeline Act. The RCA set substantially lower rates that were to be applied instead, and it ordered refunds of the unlawful charges that the TAPS carriers had collected on an interim basis, *i.e.*, the difference between the temporary rates which the carriers had collected and the final TAPS tariff rates for those years, as determined and established by the RCA.

26. The TAPS carriers appealed the RCA's order, initially to the superior court and ultimately to the Alaska Supreme Court. The superior court stayed the refund requirement pending the outcome of the carriers' appeal. The ensuing litigation was not finally resolved, nor were refunds paid, until after February 15, 2008, when the Alaska Supreme Court entered its final order upholding the RCA's decision in all respects. *See Amerada Hess Pipeline Corp. v. Regulatory Comm'n of Alaska*, 176 P.2d 667 (2008).

27. As a result of the Alaska Supreme Court's decision, the refund stay was lifted and under the terms of RCA Order No. 151, the TAPS carriers paid refunds to shippers of ANS crude oil, including BP. Among the refunds that BP collected were refunds applicable to BP's shipment of ANS crude oil to Petro Star's North Pole and Valdez refineries pursuant to the BP-

12
FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 12 of 20

Petro Star Contracts.  Pursuant to the RCA's Order No. 162, which was also appealed and upheld by the Alaska Supreme Court, the TAPS carriers also paid shippers, including BP, 10.5% interest on the refunded amounts.

28. Upon information and belief, BP and/or its affiliate(s) have collected from the TAPS carriers more than $20 million in refunds and interest applicable to BP's shipments of ANS crude oil to Petro Star under the BP-Petro Star Contracts.

29. Under the terms of the BP-Petro Star Contracts, Petro Star funded BP's payments to the TAPS carriers under the temporary 1997 – 2000 rates that the RCA determined were illegal. Those illegal rates were embedded in the prices that BP charged Petro Star for ANS crude oil and were thus passed onto and borne by Petro Star. BP has now received refunds of the illegal overcharges as determined by the RCA, plus interest at 10.5%. However, BP has failed and refused to pay to Petro Star those refunds and interest.

30. By failing and refusing to pay over to Petro Star the refund amounts and interest BP has collected pursuant to the RCA's order, BP is enjoying a windfall at Petro Star's expense. Petro Star bore the economic cost of intrastate shipping charges that the RCA has determined were illegal, but BP is now holding for itself the remedy ordered by the RCA for those illegal overcharges.

31. The BP-Petro Star Contracts that governed exchanges of ANS crude oil between BP and Petro Star—*i.e.*, the 1991 Contract, the 1992 Exchange Contract, the 1999 North Pole Exchange Contract, and the 1999 Valdez Exchange Contract—required Petro Star to pay BP an "exchange differential" to reimburse BP for "quality bank charges" that BP was required to pay

13
FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 13 of 20

under the TAPS tariffs. Those TAPS quality bank charges accounted for the difference between the quality of the oil that Petro Star returned to TAPS and the quality of the oil in the common TAPS stream. The "exchange differential" that Petro Star was required to pay BP under their contracts was equal to the TAPS quality bank charges paid by BP plus, in some cases, an administrative fee charged by BP. Under the BP-Petro Star Contracts, any retroactive changes to the TAPS quality bank charges, which TAPS imposed from time to time and which BP was required to pay in the first instance, resulted in retroactive changes to the exchange differential that Petro Star was required to pay to BP. Thus, the TAPS quality bank charges paid by BP were passed through to Petro Star, which periodically made quality bank adjustment payments, plus interest, to BP.

32. On or about September 28, 2007, pursuant to the BP-Petro Star Contracts and an invoice issued by BP on or about September 25, 2007, Petro Star paid to BP, and BP accepted, retroactive quality bank adjustment payments in the total amount of $8,891,789, including interest, for the months ending February 29, March 31, April 30, May 31, and June 30, 2000, relating to ANS crude oil exchanged at the points of delivery for both the North Pole and Valdez refineries.

**FIRST CAUSE OF ACTION: BREACH OF CONTRACT**

33. Petro Star incorporates by this reference Paragraphs 1 - 32 of this Complaint as if fully set forth.

14

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

34. The BP-Petro Star Contracts all provided formulas for the selling price per barrel that Petro Star was required to pay BP for ANS crude oil. Those contractual formulas incorporated, directly or indirectly, TAPS intrastate tariff rates for shipments of crude oil from Pump Station No. 1 on the ANS to either the GVEA pipeline junction or the junction of TAPS and Petro Star's Valdez refinery.

35. Because of regulatory investigations and subsequent judicial appeals, the final, lawful intrastate TAPS tariffs applicable to the pricing formulas for shipments subject to the 1997 – 2000 TAPS intrastate tariffs were not established until after the February 15, 2008 decision of the Alaska Supreme Court in *Amerada Hess Pipeline Corp. v. Regulatory Comm'n of Alaska*, 176 P.2d 667 (2008). The RCA allowed the TAPS Carriers to collect the shipping rates charged shippers (including BP) during the relevant years on only a temporary basis, subject to refund.

36. Based on the final, lawful TAPS intrastate rates established by the RCA in Order No. 151, Petro Star overpaid BP for ANS crude oil under the BP-Petro Star Contracts. BP has itself received refunds, with interest, for the overcharges as determined by the RCA. By failing and refusing to pay over to Petro Star the refund amounts, with regulatory interest, applicable to BP's shipments of ANS crude oil pursuant to the BP-Petro Star Contracts, BP has breached those contracts. In the alternative, by failing and refusing to re-calculate the contractual prices due under the BP-Petro Star Contracts based on the final TAPS tariff rates and to refund to Petro Star the difference between those prices and what Petro Star paid, BP has breached the contracts.

15

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 15 of 20

37. BP's conduct as described herein also constitutes a breach of the covenant of good faith and fair dealing that is implied by law in the BP-Petro Star Contracts.

38. Petro Star is entitled to recover from BP as damages the difference between the amounts it paid BP pursuant to the BP-Petro Star Contracts and the amounts that would have been due had the final TAPS intrastate tariff rates, as determined by the RCA, been in force at the time Petro Star made those payments, together with interest.

39. In the alternative, if BP prevails against this claim on the alleged defense of novation or prior release, or any other defense based on a theory that Petro Star's rights or BP's obligations under the BP-Petro Star Contracts were extinguished at any time prior to September 28, 2007, then Petro Star is entitled to recovery and reimbursement from BP of the $8,891,798 in quality bank adjustment payments that Petro Star made to BP pursuant to the BP-Petro Star Contracts on or about September 28, 2007.

40. Petro Star is also entitled to recover from BP, as indemnification, Petro Star's costs and expenses, including reasonable attorneys fees, incurred in pursuing its remedies under the BP-Petro Star Contracts.

## SECOND CAUSE OF ACTION:

## REFORMATION OF CONTRACT BASED ON UNCONSCIONABILITY

41. Petro Star incorporates by this reference Paragraphs 1 - 32 of this Complaint as if fully set forth.

16
FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 16 of 20

42.     Pleading in the alternative, Petro Star alleges that if the payment terms of the BP-Petro Star Contracts are interpreted to mean that Petro Star is not entitled to receive the TAPS intrastate tariff refunds received by BP, with interest, that are applicable to BP's shipments of ANS crude oil pursuant to the BP-Petro Star Contracts, then those payment terms are and were unconscionable at the time those Contracts were made, and the Contracts should be reformed to avoid the unconscionable result of BP retaining the TAPS intrastate tariff refunds as a windfall and to provide that Petro Star, as the purchaser under those Contracts, is entitled to any and all refunds received by BP for tariff rates that were paid in excess of the final, lawful, just and reasonable TAPS tariffs, as determined by the RCA, in connection with BP's sale of ANS crude oil to Petro Star, together with interest.

43.     Based on the reformed BP-Petro Star Contracts, Petro Star is entitled to recover from BP as damages the difference between the amounts it actually paid BP pursuant to the BP-Petro Star Contracts, based on TAPS tariff rates that were not lawful, just and reasonable, and the amounts that Petro Star should or would have paid if the final, lawful, just and reasonable TAPS intrastate tariff rates, as determined by the RCA, had been in force at the time Petro Star made those payments, together with interest.

44.     In the alternative, if BP prevails against this claim on the alleged defense of novation or prior release, or any other defense based on a theory that Petro Star's rights or BP's obligations under the BP-Petro Star Contracts were extinguished at any time prior to September 28, 2007, then Petro Star is entitled to recovery and reimbursement from BP of the $8,891,798 in

17

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 17 of 20

quality bank adjustment payments that Petro Star made to BP pursuant to the BP-Petro Star Contracts on or about September 28, 2007.

45. Petro Star is also entitled to recover from BP, as indemnification, Petro Star's costs and expenses, including reasonable attorneys fees, incurred in pursuing its remedies under the BP-Petro Star Contracts as reformed.

## THIRD CAUSE OF ACTION:

## UNJUST ENRICHMENT AND QUASI-CONTRACT

46. Petro Star incorporates by this reference Paragraphs 1 - 32 of this Complaint as if fully set forth.

47. Pleading in the alternative, Petro Star alleges that BP would be the beneficiary of an unjust enrichment if it were permitted to retain the amount refunded to it by the TAPS carriers plus interest as prescribed by the RCA. Petro Star made payments to BP for crude oil in amounts that included interim transportation charges assessed by the TAPS carriers. The RCA ultimately established final TAPS tariff rates significantly lower than those interim charges and required the TAPS carriers to refund the difference plus interest. Thus BP has received and appreciated a benefit conferred by Petro Star in the form of excessive payments for the transportation and delivery of the crude oil that Petro Star purchased from BP. Because BP has now received refunds plus interest on shipping charges attributable to its transportation and delivery of crude oil to Petro Star, it would be inequitable and unjust for BP to retain both the full amount of Petro

18

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 18 of 20

Star's payments attributable to the carriers' interim rates and the amount of the refund and interest from the TAPS carriers.

## PRAYER

WHEREFORE, Petro Star prays for entry of judgment awarding Petro Star the following relief:

1. Damages for BP's breach of contract, as written or as reformed, and/or restitution for BP's unjust enrichment, in an amount to be determined at trial or upon summary judgment;

2. Reimbursement of the quality bank adjustment payments that Petro Star made to BP on or about September 28, 2007, in the amount of $8,891,798, if the Court finds that any rights of Petro Star or obligations of BP under the BP-Petro Star Contracts were extinguished at any time prior to September 28, 2007;

3. Prejudgment and post-judgment interest on any damages, restitution, and/or reimbursement of quality bank adjustment payments awarded to Petro Star, calculated at the highest lawful rate;

4. Petro Star's costs of suit, including reasonable attorneys fees; and

5. Such other and further relief as the Court may find to be just and proper.

19

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100

Case 3:11-cv-00064-RRB   Document 33   Filed 08/10/11   Page 19 of 20

DATED this 10th day of August, 2011.

       SUSMAN GODFREY L.L.P.
       Attorneys for Plaintiff

       By: /s/ Floyd G. Short
        Parker C. Folse, III (*pro hac vice*)
        Floyd G. Short (*pro hac vice*)
        1201 Third Avenue, Suite 3800
        Seattle, WA 98101
        Telephone: (206) 373-7381
        Facsimile: (206) 516-3883
        fshort@susmangodfrey.com
        pfolse@susmangodfrey.com

        Patricia L. Zobel
        DeLisio Moran Geraghty & Zobel, P.C.
        943 W. 6th Avenue
        Anchorage, AK 99501
        Telephone: (907) 279-9574
        Facsimile: (907) 276-4231
        E-mail: pzobel@dmgz.com
        Bar No. 7906067

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 10 day of August, 2011,
a copy of the foregoing document was served electronically
on:

Louis R. Veerman
Michael S. McLaughlin
Ronald C. Redcay
James F. Speyer

Susman Godfrey L.L.P.

By: /s/Floyd G. Short

                           20

FIRST AMENDED COMPLAINT
Petro Star v. BP Oil Supply Co., et al.
Case No. 3:11-cv-0064-RRB
1620490v1/011100